# United States District Court

__MIDDLE__ DISTRICT OF __ALABAMA__

| | |
|---|---|
| **In the matter of the Search of**<br>(Name, address or brief description of person, property or premises to be searched)<br><br>**4207 County Road 9, Clanton, Alabama, a single level red brick residence located on the east side of Chilton County Road 9** | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**<br><br>CASE NUMBER: 2:05mj143-W |

I __M. Todd Mims__ being duly sworn depose and say:

I am a(n) __Drug Enforcement Administration Task Force Agent__ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

**4207 County Road 9, Clanton, Alabama, a single level red brick residence located on the east side of Chilton County Road 9**

in the __Middle__ District of __Alabama__

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment A**

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**contraband or property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Title __21__ United States Code, Section(s) __846__.

The facts to support the issuance of a Search Warrant are as follows:

**See Attached Affidavit Which is Incorporated by Reference Herein**

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

November 9, 2005                              at    Montgomery, Alabama
_____                           _____
Date                                                City and State

Susan Russ Walker, U.S. Magistrate Judge            _____
_____                           Signature of Judicial Officer
Name and Title of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, M. Todd Mims, Task Force Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) being duly sworn, depose and state as follows:

1. Your affiant is a Task Force Agent with the Drug Enforcement Administration (DEA). I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am currently employed with the Elmore County, Alabama Sheriff's Department and have been so employed for six and one half (6 ½) years. I am currently assigned to the United States Drug Enforcement Administration (DEA), and have been so assigned for the past one and one half years (1 ½). I am currently assigned to the New Orleans Division of the Drug Enforcement Administration, the Montgomery District Office. Prior to becoming an Elmore County, Alabama Sheriff's Deputy, I was a Millbrook, Alabama, Police Officer for six (6) months. I have worked exclusively on narcotics investigations for four (4) years. I have investigated criminal violations of the Federal controlled substance laws, including, but not limited to, investigations involving smuggling of controlled substances, distribution of controlled substances in violation of Title 21, United States Code, Section 841; and laundering of the

proceeds derived from the sale of controlled substances in violation of Title 18, United States code 1956 and 1957.

3. I have conducted and participated in investigations that have resulted in the seizure of illegal drugs including, but not limited to, multiple kilogram quantities of cocaine, multi-kilogram quantities of marijuana, multi-kilogram quantities of methamphetamine, and Methylenedioxymethamphetamine (MDMA), various designer drugs that are controlled substances, and millions of dollars in illegal drug proceeds. I am familiar with, and have participated in all of the normal methods of investigation, including, but not limited to, foot, auto, air and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, trap and traces, cellular telephone cite tracking, mobile tracking devices, the use of undercover agents, and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs and financial records.

4. I have received training in investigations involving the interception of wire communications. I have also participated in investigations involving the interception of wire communications and of electronic communications of digital display paging devices. I am familiar with the ways in which narcotics traffickers conduct their business, including, but not limited to, their methods of importing and distributing narcotics, their use of telephones, cellular telephones and digital display paging devices and their

use of numerical codes and code words to conduct their transactions. I have participated in numerous searches, pursuant to consents as well as warrants, for narcotics and other related drug trafficking contraband during my seven years in law enforcement; in said searches, narcotics as well as currency, ledgers, logs, books, documents evidencing drug dealing and assets, pagers, cellular phones, and other electronic devices (computers, fax machines) have been found.

5. Based on my training, experience, and participation in investigations of traffickers in large quantities of cocaine, crack cocaine and marijuana in the United States, in the tracings of proceeds on transactions involving illegal narcotics and in uncovering smuggling and distribution of illegal narcotics, I know that:

    a. Large scale narcotics traffickers must keep on hand large amounts of United States Currency in order to maintain and finance their ongoing drug business.

    b. Drug traffickers very often place their assets in the names of others, including parents, spouses, and children to avoid detection of these assets by law enforcement.

    c. Even though these assets are in other persons' names, the drug traffickers' continue to use these assets and exercise control over them.

    d. Drug traffickers encounter tremendous problems handling large sums of U.S. currency through financial institutions because

of the currency transaction report which is required to be completed and filed with the Internal Revenue Service any time cash transactions exceed $10,000, which causes them to maintain large amounts of cash in other, easy to access, but secure places (such as safe deposit boxes and safes).

    e. Drug traffickers maintain telephone books, both personal and electronic, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, ordering, sale, purchase, and distribution of controlled substances.

    f. These aforementioned telephone books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are stored and readily available to the drug traffickers in their houses, storage sheds, rent houses, safes, banks, safety deposit boxes and places of business.

    g. It is common for large scale drug traffickers to secrete contraband, including controlled substances, proceeds from drug sales, including personal items, electronic items such as televisions, VCR's, stereos, and records of drug transactions in secure locations such as safes, lock boxes, safety deposit boxes in their names and relatives' names for ready access, and to conceal them from law enforcement.

    h. Persons involved in drug trafficking conceal in secure locations, with ease of access, large amounts of currency, financial instruments and evidence for financial transactions

relating to the obtaining, transfer, secreting and spending of large sums of money obtained from engaging in drug trafficking activities.

 i. When drug traffickers amass large amounts of money from trafficking in illegal drugs, they attempt to hide their illegal origin. In order to accomplish this, they use banks, cashiers checks, money drafts, real estate and business fronts.

 j. Documents relating to such attempts to hide the illegal origin of such proceeds are kept where the traffickers have ready access to them, often in their houses or structures over which they have control, places of business, and often in close proximity to illegal drugs.

 k. It is common for drug traffickers to travel to major distribution centers and cities such as New York, Miami and Houston to receive and distribute drugs. These methods of transportation include commercial airlines, commercial vessels, private aircraft, rental vehicles, and other means of transportation.

 l. It is common for drug traffickers to keep and maintain records of their travels in locations for easy access such as their residences, places of business and other structures over which they exercise control.

 m. Drug traffickers commonly maintain addresses or phone numbers in books, papers, compact electronic telephone books which show names, addresses, and/or telephone numbers for associates in the trafficking organization, and they keep such records in their

homes, places of business or other structures over which they exercise control.

n.  Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs; they usually keep these photographs in their homes or places of business with other drug related documents.

o.  Drug traffickers often maintain and utilize cellular phones and pagers to facilitate drug trafficking. It is common for these communication devices to be listed in other persons' names. However, drug traffickers continue to use these devices and maintain control over them. Drug traffickers keep billing records for these mobile phones and pagers in their homes or businesses or other structures over which they exercise control so they are readily accessible.

p.  It is common for drug traffickers to use cellular phones, fax machines, pay phones, and long distance calling card services to avoid detection and interception by law enforcement agents.

q.  Drug traffickers often maintain the items listed in Attachment A for long periods of time and rarely destroy them.

6. This affidavit is made in support of an application to search the residence located at 4207 County Road 9, Clanton, Alabama, and to seize those items listed in Attachment A.

7. The information in the paragraphs below which is furnished in support of this application, comes in part from agents and officers of the Drug Enforcement Administration (DEA), Agents of the Alabama Bureau of Investigation (ABI), the Prattville, Alabama Police Department, the Chilton County, Alabama Sheriff's Department, The Central Alabama Drug Task Force and other Law Enforcement Agencies and by the analysis of surveillance, information from reliable informants, pen register information, and intercepted telephone calls, the use of public records, as well as searches of criminal justice background indices concerning the narcotics trafficking activities of Clifton JOHNSON and his associates.

8. I have investigated and I continue to investigate a drug distribution organization headed by Clifton JOHNSON and other known and unknown individuals. This organization is responsible for the distribution of multi-kilogram quantities of cocaine, multi-kilogram quantities of crack cocaine and large quantities of marijuana in the Central Alabama area as well as in the Detroit, Michigan and Rock Hill South Carolina areas.

9. I believe that there is probable cause to establish that the above offenses have been committed, are being committed, and will continue to be committed by Clifton JOHNSON, Charles CRAIG and other unknown individuals at the residence located at 4207 County Road 9 in Clanton, Alabama. Said residence being a single level,

red brick residence located on the east side of Chilton County Road 9. The facts tending to support these claims are as follows:

10. In July of 2004, your affiant received information from the Central Alabama Drug Task Force regarding the drug activities of Clifton JOHNSON of Clanton, Alabama. Central Alabama Drug Task Force Agents developed confidential source, hereinafter referred to as CS#1 that purchased crack cocaine from Terrence NEWKIRK of Clanton, Alabama. Your affiant is aware of the fact that CS#1 has no felony convictions. However, your affiant is aware of the fact that CS#1 has pending drug charges for distribution of a controlled substance. Further, CS#1 is cooperating with your affiant in an effort to help himself with pending charges. DEA has no information that CS#1 has ever provided false or misleading information. CS#1 is known to be a creditable source of information. In addition, CS#1 has provided your affiant with information, some of which has been corroborated through other confidential sources information and your affiant's investigation of Clifton JOHNSON'S drug distribution organization. Further, CS#1 stated that Clifton JOHNSON was the father of NEWKIRK and that JOHNSON was transporting the drugs from California to Alabama for NEWKIRK. Your affiant received Clifton JOHNSON'S telephone numbers from CS#1. Your affiant subpoenaed the call records regarding JOHNSON'S telephones. Based on this information, your affiant along with the Central Alabama Drug Task Force and the Chilton

County, Alabama Sheriff's Department jointly targeted Clifton JOHNSON as a local leader of a drug distribution organization.

11. On April 11, 2005, CS#1, at the direction of your affiant and other agents, made a controlled purchase of 55 grams of cocaine HCL from Clifton JOHNSON in Clanton, Alabama. The cocaine purchased from JOHNSON was sent to the DEA Dallas Laboratory and tested positive for cocaine. This purchase was audio recorded by agents monitoring the operation.

12. On June 23, 2005 agents used an undercover agent from the Alabama Bureau of Investigation which accompanied CS#1 and purchased 69.7 grams of crack cocaine from Clifton JOHNSON in Clanton, Alabama. The crack cocaine purchased from JOHNSON was sent to the DEA Dallas Laboratory and tested positive for cocaine base. This purchase was audio recorded by the undercover agent and agents monitoring the operation.

13. On August 15, 2005, Federal District Judge W. Harold Albritton of the Middle District of Alabama signed an order authorizing the interception of electronic communication over target telephone #1 (205-415-0108) and target telephone #2 (205-587-2504). Target telephone #1 and target telephone #2 are subscribed to by Clifton JOHNSON at 7215 County Road 37 in Clanton, Alabama. Target

telephone #1 and target telephone #2 are used by Clifton JOHNSON.

14. On September 19, 2005 Federal District Judge W. Harold Albritton of the Middle District of Alabama signed an order extending the authorization to intercept the electronic communications over target telephone #1 (205-415-0108) and target telephone #2 (205-587-2504).

15. On August 24, 2005, at approximately 6:52 PM, agents intercepted a phone conversation between JOHNSON utilizing telephone number, (205)415-0108 and Demetrious PEGUES utilizing the telephone number (313)487-8730. During this conversation, JOHNSON explains to PEGUES that JOHNSON was arrested with a small quantity of marijuana. (Your affiant has confirmed that on August 11, 2005, the United States Border Patrol seized approximately 3.5 pounds of marijuana from JOHNSON in Sierra Blanca, Texas.) During this conversation, JOHNSON asks PEGUES if JOHNSON can get money from PEGUES. JOHNSON stated, "I been calling you man, I need some money man, and Charles hurting too, cause I had gave, I had to give that mother fucker about three grand. You know you owe me twenty-five but I gave him another thousand." PEGUES indicated that he will give JOHNSON and Charles CRAIG money. PEGUES tells JOHNSON that they need to "Chill" a while. Agents are familiar with the term "Chill" being used as a code for suspending illegal activities. Your Affiant believes that PEGUES wants to suspend operations to

prevent their operation being detected by law enforcement. PEGUES goes on to state that they should suspend their operation for a year. This indicates that the operation is so profitable that PEGUES, JOHNSON and CRAIG can afford to stop their income for one year and not be affected. JOHNSON tells PEGUES that JOHNSON and CRAIG were considering traveling to Detroit. JOHNSON stated, "But me and old Charles was gonna come there this weekend man, cause we needing some cash man." PEGUES tells JOHNSON that PEGUES needs to talk to JOHNSON face to face. PEGUES tells JOHNSON to bring CRAIG and come to Detroit this weekend. Based on these intercepted calls and other evidence uncovered during this investigation, your Affiant believes that PEGUES was operating a substantial drug trafficking operation in the Detroit Metropolitan Area.

16. As a result of this conversation your affiant along with other agents conducted surveillance of JOHNSON and CRAIG. At approximately 7:35pm on 08-26-2005, TFA Brock observed JOHNSON'S Chevrolet truck bearing AL license plate LEADFT traveling northbound on Chilton County Road 9. Agents conducted surveillance of the truck from Clanton, Alabama on 08-26-2005 until agents of the Detroit Field Division joined the surveillance near Interstate 75, exit# 15 in Monroe, MI on 08-27-2005. Agents of the Detroit Field Division then took over surveillance. Agents of the Detroit Field Division observed JOHNSON and CRAIG meet PEGUES at a residence in Detroit. Agents saw PEGUES enter the truck with

JOHNSON and CRAIG and the three travel to a residence located at 21108 Southway Drive, Macomb Township, Michigan. (On October 31, 2005 agents of the Detroit Field Division executed a search warrant at 21108 Southway Drive, Macomb Township, Michigan. The agents seized in excess of $468,000.00 in U.S. currency along with numerous vehicles and money laundering related documents.) Agents continued surveillance of CRAIG and JOHNSON until they returned to Clanton, AL, on August 28, 2005. Agents observed JOHNSON and CRAIG travel to 4207 County Road 9 Clanton, AL (CRAIG'S residence). Agents observed CRAIG exit JOHNSON'S truck carrying one small bag and a large envelope and enter the residence. Agents believe that the envelope that CRAIG carried contained illegal drug proceeds that PEGUES provided CRAIG while CRAIG and JOHNSON were in Detroit.

17. On September 29, 2005, agents intercepted a call from 205-415-0108 (Clifton JOHNSON) to 205-755-7205. According to phone records, 205-755-7205 is subscribed to by Charles CRAIG (see paragraph 19). During the call, JOHNSON comments that they (JOHNSON and CRAIG) are "two top soldiers" for PEGUES. Your affiant believes that when JOHNSON comments about being "two top soldiers" that JOHNSON is referring to their importance and roles in the narcotics operations conducted by PEGUES. In the same conversation, CRAIG states that "they been using me for the longest". Your affiant believes that CRAIG is referring to his long time role in

the narcotics organization.  CRAIG also stated that PEGUES "short changed" CRAIG every trip and that CRAIG "counted my shit when I got home".  Your affiant believes that CRAIG is relaying to JOHNSON that CRAIG was frequently paid less than the amount PEGUES agreed to pay CRAIG.  Your affiant also believes that CRAIG is stating that CRAIG counted the illegal drug proceeds that PEGUES paid CRAIG on the August 27, 2005 trip to Detroit, MI (see paragraph 16).

18.  On October 24, 2005, agents interviewed a confidential source, hereinafter referred to as CS #2.  Information given by CS #2 has been corroborated through other sources.  During the interview, CS #2 stated that Clifton JOHNSON stated to CS #2 that JOHNSON met a man in central Alabama and received money.  JOHNSON told CS #2 that the money was money from "D" in Detroit, MI.  Your affiant is familiar with "D" as an alias for Demetrious PEGUES.  Further, JOHNSON stated to CS #2 that the man that JOHNSON met in central Alabama had a wife that was sick, possibly a cancer patient. JOHNSON further told CS #2 that JOHNSON took the money to California and paid for cocaine, which JOHNSON returned to the man in central Alabama.  The man in central Alabama then delivered the cocaine to PEGUES.  As a result of the investigation, your affiant is aware that Charles CRAIG'S wife, MARY, is a cancer patient. Further, CS #2 relayed that JOHNSON stated that the man JOHNSON met in central Alabama recently traveled to Detroit, MI with JOHNSON in

JOHNSON'S Chevrolet truck (see paragraph 16). Your affiant believes that the man CS #2 is describing is Charles CRAIG.

19. Further, on July 18, 2005, agents issued an administrative subpoena to the Bellsouth Telephone Company for subscriber information on 205-755-7205. In response to the subpoena, agents received information that 205-755-7205 is subscribed to by Charles CRAIG at 4207 County Road 9, Clanton, AL. 205-755-7205 is the number that Clifton JOHNSON used to call Charles CRAIG (see paragraph 17).

20. Based on the above information, your affiant believes that the residence located at 4207 County Road 9, Clanton, Alabama, is being used by Charles CRAIG, Clifton JOHNSON and other individuals to facilitate Clifton JOHNSON'S drug distribution operation.

_____
M. Todd Mims, Task Force Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this _____ day of November, 2005.

_____
United States Magistrate Judge

## ATTACHMENT A

## PROPERTY TO BE SEIZED

(1) Books, records, ledgers, and/or writings which record the receipt and/or distribution of controlled substances including methamphetamine as well as any other memoranda relating to the transportation, ordering, purchase, delivery and/or distribution of controlled substances, which writings and records are contraband as well as evidence;

(2) Papers, tickets, notes, schedules, receipts, and other writings and objects including but not limited to gasoline receipts, air travel vouchers, and motel/hotel embossed articles, which do or tend to establish domestic and/or interstate travel in interstate commerce;

(3) Addresses and/or telephone books and papers and other writings reflecting names, addresses, and/or telephone numbers as well as bills and paid receipts reflecting telephone toll records, any and all of which reflect the names, addresses, and telephone numbers of aliases or code names of both known and unknown co-conspirators in the above-described criminal activity, as well as other indicia of telephone usage and service including pay telephone usage which indicia includes, but is not limited to, telephone credit cards, large amounts of nickel, dime and/or quarter currency, and telephone paging devices which are carried on or about the persons to receive incoming notice or messages and which are activated by telephone usage;

(4) Currency of the United States including paper and coin currency, also precious metals, jewelry, financial instruments, including but not limited to, negotiable commercial paper, and currency obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking;

(5) Photographs and videotapes, in particular, photographs or videotapes of co-

conspirators, of assets, and/or of controlled substances, in particular, methamphetamine;

(6) Safes, strong boxes, and/or other secure receptacles for the maintenance of valuable items and/or important documents including books, records, and other writings as well as United States currency as described above, and any keys or other evidence of the existence and usage of any lockers, safety deposit boxes or other secure receptacles situated elsewhere than at defendant property;

(7) Articles of false identification;

(8) Radio electronic equipment including but not limited to transceivers, receivers, scanners, antennae, RF detectors, walkie talkies, wireless transmitters as well as other electronics which are used ancillary to such equipment, including but not limited to, electrical calibration equipment, meters and test equipment;

(9) Computers or other electronic devices which are capable of storing information, including, but not limited to computers, lap tops, floppy disks, cd roms, zip disks, hard drives, and personal data assistants (PDA).

(10) Firearms;

(11) Controlled substances, in particular, methamphetamine;

(12) Paraphernalia for packaging, cutting, weighing, and distributing methamphetamine, including but not limited to, scales, bags, pipes, and duct tape;

(13) Any and all other material evidence of violations of Title 21, United States Code, Sections 848, 853, 841 (a) (1), 843 (b), 846, and 881, together with fruits, instrumentalities and evidence of crimes at this time unknown.